UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| BLC LEXINGTON SNF, LLC, doing business as Brookdale Richmond Place SNF, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 5: 19-284-DCR |
| V. | ) ) | |
| KENDRA OATIS, Administratrix of the Estate of Clementine Garred, | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Clementine Garred was a resident of Brookdale Richmond Place, a skilled nursing facility owned and/or operated by BLC Lexington SNF, LLC ("BLC Lexington") and others. Garred's daughter, Kendra Oatis ("Kendra" or the "defendant"), sued BLC Lexington and related entities in the Fayette County Circuit Court in February 2019, alleging that the entities' actions (or their failures to act) led to Garred's injury and subsequent death. In July 2019, and while the state-court action was pending, BLC Lexington and others brought the instant action against the defendant, alleging that her state-court claims against them must be submitted to arbitration.

The defendant has filed a motion to dismiss the Complaint, and BLC Lexington and its related entities have filed a motion to compel arbitration. [Record Nos. 5, 9] Because Garred and the defendant agreed to arbitrate the claims raised in state court, these claims must be submitted to arbitration. Accordingly, the defendant's motion to dismiss will be denied and the plaintiffs' motion to compel arbitration will be granted.

- 1 -

# I.    BACKGROUND

Garred was first admitted to Brookdale Richmond Place SNF in Lexington, Kentucky ("the Facility") on December 20, 2016.  Garred signed an Admission Agreement, which included the following language:

> II.    **TERM.**  The term of this Agreement shall commence on the date of admission, and continue in full force and effect until the Resident is discharged or transferred from the Provider and all Resident's personal effects are removed from the Resident's room. . . .

> VIII.    **AGREEMENT TO ARBITRATE.**  . . . Any and all claims or controversies arising out of, or in **any** way relating to, this Agreement or any of your stays at the Provider, excluding any action for eviction, and including disputes regarding interpretation, scope, enforceability, unconscionability, waiver, preemption and/or voidability of this Agreement, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties, irrespective of the basis for the duty or legal theories upon which the claim is asserted, shall be submitted to binding arbitration, as provided below, and shall not be filed in a court of law. **The parties to this Agreement further understand that a judge and/or jury will not decide their case**. . . .

> **The undersigned acknowledges that he or she has been encouraged to discuss this Agreement with an attorney. . . .**

> The Arbitration Provision shall survive your death.

[Record No. 1-1, pp. 11-14 (emphasis in original)]

These provisions were part of an Admission Agreement packet, which featured a signature line on the last page.  It does not appear that residents had the option of rejecting the arbitration clause.  Instead, arbitration was a condition of admission to the Facility.

The Admission Agreement also provided:

> IX.    **ENFORCEMENT OF THIS AGREEMENT**. . . This Agreement, along with any Attachments, which are hereby included by reference, is the only

Admission Agreement between the Provider and you except that amendments due to changes in State or Federal law or regulations are automatically deemed to be part of this Agreement. Any other changes to this Agreement are valid only if made in writing and signed by all parties. If changes in State or Federal law make any part of this Agreement invalid, the remaining terms shall stand as a valid Agreement. If there are any conflicts between the Agreement and any Attachment, the terms of the Agreement shall prevail.

*Id.* at p. 14. Garred was discharged on January 9, 2017.

Garred was re-admitted to the Facility on June 28, 2017, and was presented with a new Admission Agreement. [Record No. 1-3, p. 1] The terms of the new agreement appear to be identical to those of the first. This time, Garred's daughter Tavonne Oatis ("Tavonne") signed the agreement as Garred's "Resident Representative." *Id.* pp. 5-6, 17.

Garred was "temporarily discharged" on October 18, 2017. She was "readmitted" on October 30, 2017, and was presented with a "Memorandum of Readmission." [Record No. 1-4] The Memorandum is a one-page document indicating that Garred was admitted to the Facility on June 28, 2017, and that the Admission Agreement executed on that date was incorporated by reference. Additionally, the parties agreed to be bound by the terms previously set forth in the Admission Agreement. Kendra signed the Memorandum of Readmission as Garred's "Legal Representative." *Id.*

Garred was temporarily discharged again on November 7, 2017, but readmitted on November 20, 2017. The parties executed another Memorandum of Readmission, which Tavonne signed as "Legal Representative." [Record No. 1-5] Again, the Memorandum incorporated the Admission Agreement and the parties agreed to be bound by its terms.

Garred was discharged on November 30, 2017, but once again readmitted for the last time on December 5, 2017. [Record No. 1-6] Tavonne signed another Memorandum of Readmission stating that Garred was admitted to the facility on September 1, 2017, but there

is no record of an admission on that date. Aside from the dates, the Memorandum of Readmission is identical to the prior Memoranda, incorporating the Admission Agreement by reference. Garred remained a resident of the Facility until June 13, 2018. [Record No. 5, p. 1]

Garred passed away on August 23, 2018. [Record No. 1-2, p. 3] Kendra filed suit in state court on February 6, 2019, alleging a host of negligence and wrongful death claims against BLC Lexington and other entities and individuals involved in her mother's care. [Record No. 1-2] The facility and its related entities filed this action on July 16, 2019, seeking to compel arbitration pursuant to the Admission Agreements and Readmission Memoranda. Kendra contends that this action should be dismissed because there is no valid agreement to arbitrate any of her claims.

## II. STANDARDS OF REVIEW

### A. The Defendant's Motion to Dismiss

The defendant has moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) (lack of subject-matter jurisdiction); 12(b)(6) (failure to state a claim); and 12(b)(7) (failure to join a party under Rule 19). As the party asserting federal jurisdiction, the plaintiff has the burden of establishing that the Court has jurisdiction over this matter. *Global Tech., Inc. v. Yubei (Xinxiang) Power Steering Sys. Co., Ltd.*, 807 F.3d 806, 810 (6th Cir. 2015). When considering the defendant's factual attack on subject-matter jurisdiction under Rule 12(b)(1), the district court has "broad discretion" to consider evidence outside the pleadings to determine whether subject-matter jurisdiction exists. *Cartwright v. Garner*, 751 F.3d 752, 759-60 (6th Cir. 2014).

When it comes to a challenge under Rule 12(b)(7), the defendant bears the initial burden of proving that the plaintiffs have failed to join a necessary or indispensable party under Rule 19. *See Hall v. Allen*, No. 14-116-ART, 2014 WL 6882264, at *4 (E.D. Ky. Dec. 4, 2014). Similar to a factual challenge under Rule 12(b)(1), the Court may consider evidence outside the pleadings. *Camps v. Gore Capital, LLC*, No. 3: 17-cv-1039, 2019 WL 2763902, at *8 (M.D. Tenn. July 2, 2019).

Finally, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When presented with a challenge under Rule 12(b)(6), the Court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Generally, the Court only considers the pleadings when ruling on a motion to dismiss under Rule 12(b)(6). *Amini v. Oberlin Coll.*, 259 F.3d 493, 502-03 (6th Cir. 2001). However, the Court may consider documents attached to the Complaint and to the defendant's motion to dismiss "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). To succeed on a motion to dismiss, the defendant has the burden of demonstrating that the complaint does not state a claim upon which relief can be granted. *Directv, Inc v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

## B.    The Plaintiffs' Motion to Compel Arbitration

While motions to compel arbitration may be evaluated under the same standard as motions under Rule 12(b)(6), parties often present matters outside the pleadings in support of their arguments. And because the parties have done so here, the Court will apply the standard applicable to ruling on motions for summary judgment under Rule 56(a). *See Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002); *Imagetec, L.P. v. Lexmark Int'l, Inc.*, No. 5: 18-CV-011-CHB, 2019 WL 4739686, at *1 (E.D. Ky. Sept. 27, 2019) (collecting cases). This means that the defendant must show that there is a genuine issue of material fact regarding the validity of the agreement to arbitrate. *Id.* A material fact is one "that might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016). If the defendant does not come forward with evidence placing the validity of the arbitration agreement "in issue," the Court must compel arbitration. *Great Earth.*, 288 F.3d at 889.

## C.    The Federal Arbitration Act

The Federal Arbitration Act ("FAA") provides the backdrop for this dispute. Section 2 of the FAA "embodies the national policy favoring arbitration" and provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable."[1] 9 U.S.C. § 2; *Buckeye*

---

[1] Contracts governed by the FAA must evidence a transaction involving interstate commerce. 9 U.S.C. § 2. The Court rejects the defendant's half-hearted argument that the arbitration agreements at issue do not meet this requirement. Courts have consistently recognized that arbitration agreements in the nursing home context involved interstate commerce based on the facility's acceptance of Medicare and/or purchase of goods from out-of-state vendors. *See GGNSC Vanceburg, LLC v. Hanley*, No. 13-106-HRW, 2014 WL 1333204, at *8-9 (E.D. Ky. Mar. 28, 2014). Additionally, the arbitration clauses in Garred's Admission Agreements expressly acknowledged that the "Resident's stays at the Provider substantially involve interstate commerce." [*See* Record No. 1-3, p. 12.]

*Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). When considering a motion to compel arbitration, the Court considers whether the parties agreed to arbitrate and whether the claims fall within the scope of the arbitration agreement. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000); 9 U.S.C. § 4.

Although Kentucky law governs interpretation of the arbitration agreement, the "liberal federal policy favoring arbitration agreements" must be considered even when it comes to issues of state law. *Moses H. Cone Mem'l Hosp. v. Mercury Contr. Corp.*, 460 U.S. 1, 24 (1983). Any doubts regarding the parties' intentions should be resolved in favor of arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *Stout*, 228 F.3d at 714.

### III.    DISCUSSION

#### A.    Validity of Garred's Arbitration Agreement

##### i.    Capacity to Contract

Notwithstanding the strong federal policy favoring arbitration, there can be no agreement to arbitrate without the parties' mutual consent. *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 299 (2010); *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006). Whether the parties entered into a valid arbitration agreement is a question for resolution by the Court. *See Teamsters Local Union 480 v. United Parcel Serv., Inc.*, 748 F.3d 281, 289 (6th Cir. 2014) (citing *Granite Rock Co.*, 561 U.S. at 296). The defendant contends that any arbitration agreement under the first Admission Agreement is invalid because Garred lacked the requisite mental capacity to consent to arbitration.

There is a presumption of contractual capacity under Kentucky law. *Estate of Adams v. Trover*, 547 S.W.3d 545, 554 (Ky. Ct. App. 2018). This presumption applies to arbitration

agreements, which must be placed "on equal footing with all other contracts." *See Kindred Nursing Ctrs. Ltd. Partnership v. Clark*, 137 S. Ct. 1421, 1429 (2017); *White v. ACell, Inc.*, 779 F. App'x 359, 362 (6th Cir. 2019). An executed contract "will not lightly be set aside in the absence of clear and convincing evidence." *Lausman v. Brown*, 168 S.W.2d 579, 585 (Ky. 1943).

To establish mental incapacity, the party challenging the contract must present clear and convincing evidence showing that that the party in question was incapable of understanding and assenting to the agreement. *Hagemeyer v. First Nat. Bank & Trust Co.*, 209 S.W.2d 320, 321 (Ky. 1948); *Lausman*, 168 S.W.2d at 585. While previous or subsequent periods may be considered, the ultimate inquiry must relate to the precise time the agreement was formed. *Jefferson Std. Life Ins. Co. v. Cheek's Adm'r*, 80 S.W.2d 518, 521 (1935). In determining mental capacity, courts will look only to the party's ability to understand, and "neither age, sickness, extreme distress, or debility of the body will affect the capacity to make a contract or conveyance, if sufficient intelligence remains to understand the transaction." *Hall v. Crouch*, 341 S.W.2d 591, 594 (Ky. 1961).

The defendant provides a host of medical records in support of her argument that Garred lacked capacity to enter into the arbitration agreement on December 20, 2016. She has submitted notes from a cardiology consultation on February 10, 2016, in which she was described as a "pleasant 64-year-old female patient with [a] history of dementia," who was "awake and oriented x3 to time, place, and person and [was] very appropriate." [Record No. 5-2, p. 1] The evaluating physician also noted that Garred "[knew] the year, the name [sic], and she [did] not hesitate to answer. She answer[ed] right away. All her questions were answered right." *Id.*, p. 3.

Garred began receiving home health physical and occupational therapy services on December 5, 2016. [Record No. 5-3] On that date, she was described as having dementia-associated anxiety, but was able to provide a cogent explanation of various physical complaints. *Id.*, pp. 1-2. Garred was hospitalized for abnormal laboratory results and severe constipation on December 15, 2016. [Record No. 5-5] Then, she voiced complaints of coughing and back pain. *Id.*, p. 2. The examining physician noted that Garred was a poor historian who was slow to answer his questions. Garred's family was not present during the evaluation and was not reachable by telephone. *Id.* She was discharged to the Facility on December 20, 2016.

When Garred arrived at the Facility, she was "[a]lert and oriented to self and the [president]." [Record No. 5-6, p. 1] She reported that she was from Lexington, but did not recall which town she was in at the time. Garred was noted to have "impaired cognitive function/dementia or impaired thought processes," but was described as "pleasant and cooperative with assessment." [Record Nos. 5-6, 5-7] Garred received a "five-day scheduled assessment" on December 27, 2016. [Record No. 5-8] The evaluator again noted that Garred required care for cognitive loss/dementia, as well as a variety of physical limitations. *Id.*

Garred resumed home health services on January 13, 2017, following her first discharge from the Facility. While Garred reporting needing "considerable assistance," the intake provider noted that Garred stayed alone while her daughter worked full-time. [Record No. 5-4, p. 1] Garred was readmitted to the Facility on June 28, 2017. [Record No. 5-9] She was "[a]lert and oriented to self with confusion at times." *Id.*, p. 1. She advised that she enjoyed music, religious activities, playing bingo, watching television, and games. *Id.*

The plaintiffs point to additional evidence to demonstrate that Garred had sufficient mental capacity to enter into an arbitration agreement on the date of her initial admission. For instance, intake paperwork from December 20, 2016, designates Garred as her own "Medical Responsible Party" and "Financial Responsible Party," while her daughters are listed as emergency contacts. [Record No. 10, p. 10] Notably, Garred signed a variety of other consent forms upon admission to the Facility. While she signed forms agreeing to the administration of various medications, she declined influenza and pneumococcal vaccinations, and declined to give the Facility consent to mark her clothing. The following day, she was noted to be "[a]lert and oriented times 3/4 [and] able to make needs known." *Id.*, p. 12. These facts suggest that Garred considered the documents she signed and made a reasoned decision to accept or decline certain terms.

Although it took place a week after admission, Garred's "five-day" assessment also indicates that she possessed sufficient mental capacity at the time in question. [Record No. 10-10] The evaluator noted that Garred had some difficulty communicating, "but [was] able if prompted or given time." *Id.*, p. 6. Additionally, Garred missed some parts of communication but comprehended most conversation. *Id.* She was able to recall a series of words and identified the correct year. *Id.*, p. 7. She also accurately recalled the month and day of the week. Overall, she received a 12 out of 15 on the Brief Interview for Mental Status ("BIMS").[2] *Id.*

---

[2] The Centers for Medicare & Medicaid Services classify a BIMS score of 13 to 15 as "cognitively intact," while a score of 8 to 12 is "moderately impaired." *See* https://downloads.cms.gov/files/mds-3.0-rai-manual-v1.17.1_october_2019.pdf (last visited Nov. 20, 2019).

Based on the foregoing evidence, the defendant has not established by clear and convincing evidence that her mother was unable to understand the arbitration clause that was part of the December 20, 2016 Admission Agreement. Although Garred had some cognitive limitations, she was able to understand and express herself, given sufficient time and/or prompting. Garred's rejection of several terms upon admission demonstrates that she did not blindly accept whatever documents the plaintiffs placed in front of her. The Admission Agreement stated in plain, easy-to-understand language (printed in bold) that the parties would be giving up their right to have a judge or jury decide their case. The Court is unpersuaded that Garred did not understand this provision when she signed the Admission Agreement. Accordingly, the agreement to arbitrate will not be set aside based on lack of competence.

### ii.     Effect of Subsequent Agreements

Ordinary, contract principles are used to interpret arbitration agreements. *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 454 n.4 (6th Cir. 1999) (citing *Volt Info. Sciences, Inc. v. Bd. of Trustees*, 489 U.S. 468, 475 (1989)). The arbitration provision included in the December 20, 2016 Admission Agreement featured a "remain-in-effect" clause requiring Garred to arbitrate any claims related to "any of [her] stays" at the facility. [Record No. 1-1, p. 12] When presented with the same agreement on June 28, 2017, Tavonne signed it, although it is undisputed that she lacked authority to bind Garred to arbitration. *See Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 593 (Ky. 2012). Accordingly, the Court must determine what effect, if any, the second agreement to arbitrate had on Garred's initial agreement to do so.

A trio of recent cases assists the Court in answering this question. Joseph Badgett was admitted to Golden LivingCenter Mt. Holly ("Mt. Holly") in June 2013. *GGNSC Louisville*

*St. Matthews LLC v. Badgett*, 728 F. App'x 436, 438 (6th Cir. 2018). He signed an Admission Agreement and an optional Alternative Dispute Resolution ("ADR") agreement upon admission. The ADR agreement provided that it would remain in effect for all care and services rendered by Mt. Holly or its affiliates, including services provided after Badgett's discharge and readmission. *Id.*

Badgett was discharged from Mt. Holly and was later admitted to its affiliate, GLC St. Matthews ("St. Matthews") in September 2015. Upon admission to St. Matthews, Badgett executed a new Admission Agreement, which expressly superseded any prior admission agreements, but provided that any prior ADR agreement remained binding. *Id.* at 439. Despite the provision concerning prior ADR agreements, Badgett was presented with a new ADR agreement, which he declined. *Id.* at 439.

Following Badgett's death, the administrator of his estate brought a negligence action against the facilities in state court. The facilities, in turn, filed an action in federal court seeking to compel arbitration of the administrator's claims. The federal district court began by acknowledging that Badgett had entered into binding admission and arbitration agreements upon his admission to Mt. Holly. It then went on to consider the effect of the set of agreements Badgett executed upon his admission to St. Matthews. *Id.* at 440-41.

The court quickly determined that the second Admission Agreement trumped the first, since it explicitly superseded any prior admission contract. *Id.* at 440. However, reconciling the two arbitration agreements was less straightforward. The court determined that, because both arbitration agreements purported to govern claims arising from Badgett's stay at St. Matthews, the two agreements were part of the same transaction. This allowed the court to examine both documents to discern the parties' intent regarding arbitration. *Id.* (citing *Veech*

*v. Deposit Bank of Shelbyville*, 128 S.W.2d 907, 913 (1939) ("Different instruments relating to and constituting a part of the same transaction may be interpreted together in determining the intention of the parties.")).

The court ultimately concluded that the second arbitration agreement constituted an implied novation of the first. An implied novation occurs "whenever the new contract is manifestly in place of or is inconsistent with a former one, or which renders a former contract impossible of performance." *Id.* at 441. Although Badgett initially agreed to arbitrate any claims against the nursing homes, he changed his mind when presented with a second opportunity to accept or reject this condition. Since the two agreements were inherently inconsistent, the more recent took the place of the former.

The United States District Court for the Western District of Kentucky recently applied a similar analysis in *Campagna v. GGNSC Louisville Hillcreek, LLC*, No. 3:16-cv-507, 2018 WL 3041081 (W.D. Ky. June 19, 2018). Franklin Grimes was admitted to GGNSC Louisville Hillcreek ("Hillcreek") on January 11, 2010, and remained there until his discharge on November 8, 2010. Grimes subsequently stayed at Hillcreek from February 19, 2013 to March 8, 2013; March 21, 2013 to March 23, 2013; and March 25, 2013 until his death on June 11, 2015. Grimes' daughter, Doris Campagna, brought negligence and wrongful death claims against Hillcreek on Grimes' behalf.

Grimes signed an admission agreement upon his initial admission. He then entered into a new admission agreement on February 19, 2013, and again on March 25, 2013. Each admission agreement expressly superseded any prior agreement concerning Grimes' admission to Hillcreek. Grimes also signed a new arbitration agreement, which included a remain-in-effect clause, upon each admission. *Id.* at *1. Campagna challenged the validity of

the agreements "based on the order in which they may have been presented to Grimes." *Id.* at *2.

Just as in *Badgett*, the court concluded that the newest admissions agreement controlled. However, the arbitration agreements, with their remain-in-effect provisions, all constituted part of the same transaction. Accordingly, the court examined all three arbitration agreements and concluded that the parties clearly intended to arbitrate their disputes.

This analysis is applicable to the present case. Here, there are two competing admissions agreements. While the agreements do not include a supersession clause, each purports to be the "sole agreement" between Garred and the facility. Accordingly, the Court assumes that the later agreement controls, particularly since the defendant's claims concern the plaintiffs' alleged actions between June 28, 2017 and June 13, 2018. The June 2017 admission date is referenced in the Memoranda of Readmission, further indicating that the second admission agreement controls.

Each arbitration clause purports to govern Garred's subsequent admissions to the Facility. In other words, the "any-of-your-stays" provision is functionally similar to the remain-in-effect clauses in *Badgett* and *Campagno*. Accordingly, just as in those cases, the two arbitration provisions constitute parts of the same transaction, and the Court may look to both in determining the parties' intent.

The Court is not persuaded by the defendant's argument that the second agreement to arbitrate constitutes a novation of the first. There simply is no indication that the parties intended the second arbitration agreement to extinguish and replace the first. *See White/Reach Brannon Rd., LLC v. Rite Aid of Ky, Inc.*, 488 S.W.3d 631, 636 (Ky. Ct. App. 2016) (citing *Combs v. Morgan*, 211 S.W.2d 821, 825 (Ky. 1948)). Unlike in *Badgett*, the second agreement

here was not inconsistent with the first, nor did it render performance of the first agreement impossible. *Id.* at 636-37. Instead, Tavonne's agreement to arbitrate has no impact on Garred's valid agreement to arbitrate claims related to "any of [her] stays" at the facility.

The Sixth Circuit's more recent decision in *GGNSC Louisville Hillcreek, LLC v. Estate of Bramer*, 932 F.3d 480 (6th Cir. 2019) is also instructive. Robert Bramer was admitted to Golden Living Center—Hillcreek ("Hillcreek") multiple times over an 18-month period in 2015 and 2016. *Id.* at 482. Following Bramer's death, his estate sued the nursing home in state court. The nursing home filed a petition to compel arbitration in federal court.

Bramer was presented with an admission packet upon each of his three admissions to Hillcreek. Each packet included an optional ADR agreement. *Id.* at 483. The first, dated January 5, 2015, was purportedly signed by Bramer, although his estate argued that the signature was forged. The second agreement, dated January 26, 2015, was signed by Bramer's wife. The third, dated July 13, 2016, was unsigned.

The court stated, "[w]e can reach no conclusion other than that re-presenting the contract to the Bramers was behavior unmistakably showing that no prior agreement controlled." *Id.* at 486. It equated Bramer's refusal to sign the third optional arbitration agreement with "Badgett's choice to sign below the line declining arbitration." *Id.* Accordingly, the court determined that the parties had abandoned the first two arbitration agreements in favor of the third.

The court explained that, "where it is claimed that by reason of inconsistency between the terms of a new agreement and those of the old[,] the old one is discharged, the fact that such was the intention of the parties must clearly appear." *Id.* at 486. Additionally, rescission of a prior contract requires a meeting of the minds, which "may be shown by the conduct of

- 15 -

one party inconsistent with the continued existence of a contract, or abandonment or repudiation of the contract, *and knowledge of, and acquiescence to, such abandonment or repudiation by the other.*" *Id.* at 487 (quoting 17B C.J.S. *Contracts* § 591) (emphasis added). *See also Texaco, Inc. v. Debusk*, 444 S.W.2d 261, 263 (Ky. 1969) ("[A] contract will be treated as abandoned or rescinded where the acts and conduct of one party inconsistent with its existence are acquiesced in by the other party.").

The undersigned acknowledges that it makes little sense for the plaintiffs to re-present a contractual term that the parties have already agreed to and remains in effect. And according to the decision in *Bramer*, the facility's doing so is "fundamentally inconsistent with the continued existence of an earlier identical agreement." *Id.* at 487. However, considering all of the circumstances presented in this case, there is no indication that either party wished to repudiate or rescind the original agreement to arbitrate. After all, arbitration was a condition of admission, which Garred did not have the option of rejecting, unlike the parties in *Badgett* and *Bramer*. Further, neither Garred nor her daughters took any actions inconsistent with a desire to arbitrate any disputes arising out of Garred's stays at the Facility. Put differently, there was no meeting of the minds with respect to rescinding the first agreement or forming a new one which would not require Garred to arbitrate her claims against the Facility.

Finally, the defendant contends that the December 20, 2016 Agreement "terminated by its own terms," when Garred was discharged from the Facility on January 9, 2017. This argument is based on the "II. TERM" provision appearing early in the Admission Agreement, which states that the agreement "continue[s] in full force and effect until the Resident is discharged or transferred from the Provider and all Resident's personal effects are removed from the Resident's room." If this were the only provision concerning the term of the

agreement, the defendant's argument might hold water. However, the arbitration clause includes its own "term" provision—to wit, that the resident will arbitrate any claims concerning *any* of her stays at the Facility and that the arbitration agreement survives the resident's death.

Under Kentucky law, contracts should be examined as a whole, giving effect to every word whenever possible. *Invensys, Inc. v. Henry Vogt Machine Co.*, No. 2007-CA-606, 2008 WL 2696828, at *5 (Ky. Ct. App. July 11, 2006). Further, a contract should be read in a way that reconciles all of its provisions and interprets them consistently with common sense. *Marshall v. Piles*, 66 Ky. 249, 253 (Ky. 1867). The defendant's suggested reading would render portions of the arbitration clause meaningless and, therefore, should be avoided if possible.

Despite the defendant's claim to the contrary, the two provisions are reconcilable. Section II immediately precedes terms regarding obligations of the provider, payment information, and residents' rights and obligations during their stays. As the plaintiffs point out, the most natural reading of the general "term" provision governs the rights and obligations associated with a resident's day-to-day life at the Facility. For example, once a resident's stay has concluded, the Facility is no longer obligated to provide services to that individual. Similarly, once a resident is discharged, he or she is no longer bound by the Facility's rules of residency.

 "It is a familiar principle of legal construction that the specific provisions of a contract are to be given preference over the general provisions, and if there is a conflict between the two any reconciliation should give full effect to the more specific." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 596 (6th Cir. 2001) (quoting *Bank of Tokyo-Mitsubishi, Ltd. v.*

*Kvaerner*, 243 A.D.2d 1, 8 (N.Y. App. Div. 1998)).  Additionally, the strong presumption in favor of arbitration supports application of a survival clause within an arbitration provision. *See Huffman v. Hilltop Cos., LLC*, 747 F.3d 391, 398 (6th Cir. 2014) (holding that arbitration clause did not expire despite parties' failure to list it in the contract's survival clause). Regardless, for the reasons explained herein, the general provision can be given full effect while still giving effect to every word of the more specific arbitration provision.

Based on the foregoing, there is a valid arbitration agreement, which survives Garred's death.

### B.     Motion to Dismiss Under Rule 12(b)(1)

#### i.     Look-Through Approach

Federal courts are courts of limited jurisdiction.  *Uboh v. United States Equestrian Found.*, 384 F. Supp. 3d 780, 782 (E.D. Ky. 2019) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)).  Original jurisdiction arises when there is complete diversity of citizenship between the plaintiffs and defendants or the complaint presents a substantial question of federal law.  *See* 28 U.S.C. §§ 1441, 1331, 1332.  The FAA does not provide an independent basis for federal subject matter jurisdiction.  *Am. Fed. Of Television & Radio Artists, AFL-CIO v. WJBK-TV (New World Comms. of Detroit, Inc.)*, 164 F.3d 1004, 1007 (6th Cir. 1999) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).

Jurisdiction in this case is based on diversity between the plaintiffs and the defendant.[3] *See* 28 U.S.C. § 1332.  However, the defendant contends that the Court should "look through"

---

[3]  The plaintiffs are citizens of Delaware and Tennessee.  Defendant Oatis is a citizen of Indiana but, as administrator of Clementine Garred's estate, she is imputed with Garred's state of

to her underlying state-court complaint to determine that complete diversity actually does not exist. Specifically, she alleges that two facility administrators, Randall Conforti and Jeff Stidham, who are named as defendants in the state-court action, are Kentucky citizens. She contends that the plaintiffs failed to join Conforti and Stidham as plaintiffs here because doing so would have destroyed diversity, preventing the plaintiffs from being able to file suit in this Court.

In *Vaden v. Discover Bank*, 556 U.S. 49 (2009), the Supreme Court held that a district court may "look through" a petition to compel arbitration under the FAA, to the parties' underlying substantive controversy to determine whether the action arises under federal law. However, this Court and others within the Sixth Circuit have determined that the look-through approach does not extend to diversity cases. *See e.g., Diversicare Leasing Corp. v. Hamilton*, No. 17-125-HRW, 2018 WL 3235787, *5 (E.D. Ky. July 2, 2018); *Preferred Care, Inc. v. Howell*, No. 16-13-ART, 2016 WL 2858523, at *1 (E.D. Ky. May 13, 2016); *Brookdale Senior Living, Inc. v. Caudill*, No. 5: 14-cv-098-DCR, 2014 WL 3420783, at *3 (E.D. Ky. July 10, 2014) (citing *Northport Health Servs. of Arkansas, LLC v. Rutherford*, 605 F.3d 483, 490–91 (8th Cir. 2010)). The defendant has not identified any authority to the contrary, and the Court remains persuaded that this approach applies only in cases invoking the court's federal-question jurisdiction. *See id. See also Brookdale Senior Living, Inc. v. Walker*, No. 5:15-cv-206-KKC, 2016 WL 1255722, at *2–3 (E.D. Ky. March 29, 2016); *GGNSC Louisville*

---

citizenship. *See Winburn v. Liberty Mut. Ins. Co.*, 933 F. Supp. 664, 666 (E.D. Ky. 1996) (citing *Adler v. Adler*, 862 F. Supp. 70, 72 (S.D.N.Y. 1994)). The parties seem to agree that Garred was a citizen of Kentucky, so the Court will make this presumption for purposes of this analysis.

*Hillcreek, LLC v. Watkins*, No. 3:15-cv-902-DJH, 2016 WL 815295, at *2 (W.D. Ky. Feb. 29, 2016).

### C.      Motion to Dismiss Under Rule 12(b)(7)

### i.      Failure to Join Administrators

The defendant also argues that this matter should be dismissed based on the plaintiffs' failure to join administrators Conforti and Stidham, whom she contends are indispensable parties. The first step in determining whether Conforti and Stidham are indispensable to the resolution of this matter is to determine whether they are necessary, as defined by Rule 19 of the Federal Rules of Civil Procedure. A party is deemed necessary if:

> (A)  in that person's absence, the court cannot accord complete relief among existing parties; or

> (B)  that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

>> (i)  as a practical matter impair or impede the person's ability to protect the interest; or

>> (ii)  leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).

The defendant contends that Conforti and Stidham are necessary parties because the state-court complaint includes allegations of individual negligence by Conforti and Stidham that "occurred in conjunction with, and are intrinsically interwoven with, the breach of duty alleged against the corporate defendants." [Record No. 5-1, p. 26] If this Court and the state court reached different conclusions concerning the enforceability of the arbitration agreement, she reasons, Conforti and Stidham would face inconsistent procedural remedies. Based on

Conforti and Stidham's interest in the action, coupled with the risk of inconsistent remedies, the Court will assume that they are necessary parties. *See Walker*, 2016 WL 1255722, at *3.

Because Conforti and Stidham's joinder would destroy diversity, the Court must determine whether they are indispensable parties under Rule 19(b). *See PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 200 (6th Cir. 2001). This requires the Court to decide whether, in equity and good conscience, the action may proceed in their absence or should be dismissed. Fed. R. Civ. P. 19(b). *See also Republic of Philippines v. Pimentel*, 553 U.S. 851, 862–63 (2008). The Court considers the following factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

> (2) the extent to which any prejudice could be lessened or avoided by:

>> (A) protective provisions in the judgment;

>> (B) shaping the relief;

>> (C) other measures;

> (3) whether a judgment rendered in the person's absence would be inadequate; and

> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

Courts in this district and beyond have concluded that nursing facility administrators who are named as defendants in parallel state-court actions are not indispensable parties to federal courts actions to compel arbitration. *See GGNSC Frankfort, LLC v. Tracy*, No. CIV. 14-30-GFVT, 2015 WL 1481149, *5 (E.D. Ky. Mar. 31, 2015); *GGNSC Louisville Camelot, LLC v. Coppedge*, No. 3: 17-cv-127-DJH, 2018 WL 1403906, at *2 (W.D. Ky. Mar. 20, 2018).

The defendant relies on *Jenkins v. Reneau*, 697 F.2d 160 (6th Cir. 1983) to advance the argument that Conforti and Stidham are indispensable parties. In that case, an heir of Flora Jenkins sued attorneys who represented him in a negligence/wrongful death action against the nursing home that had cared for Jenkins. *Id.* at 161. The attorneys filed a motion to dismiss, arguing that a second heir was an indispensable party whose joinder would destroy diversity. The court agreed with the attorneys, reasoning that any duty owed to the plaintiff arose from a contract with the law firm to which both heirs were parties. *Id.* at 162. Relying on Tennessee law, the court explained that joinder is required where plaintiffs are jointly affected by a tort. *Id.*

The defendant has not identified any analogous rule in Kentucky that requires joinder when plaintiffs are jointly affected by a tort. Regardless, the plaintiffs here do not claim to be tort victims—instead, they seek enforce a valid arbitration agreement. The decision in *Jenkins* does not persuade this Court to depart from the well-established line of cases under *PaineWebber*, 276 F.3d at 201, which hold that nursing home administrators are not indispensable parties when nursing homes seek to compel arbitration. *See, e.g., BLC Lexington SNF, LLC v. Skipworth*, No. 5: 18-431-DCR, 2018 WL 6816067, at *3 (E.D. Ky. Dec. 27, 2018); *Richmond Health Facilities-Madison, L.P. v. Shearer*, No. 5: 17-255-KKC, 2017 WL 3273381, at *2 (E.D. Ky. Aug. 1, 2017); *Diversicare of Nicholasville, LLC v. Lowry*, 213 F. Supp. 3d 859, 864-65 (E.D. Ky. 2016); *Tracy*, 2015 WL 1481149, *5; *GGNSC Vanceburg, LLC v. Hanley*, No. 13-106-HRW, 2014 WL 1333204, at *4 (E.D. Ky. Mar. 28, 2014); *GGNSC*

*Louisville Hillcreek, LLC v. Warner*, No. 3: 13-CV-752-H, 2013 WL 6796421, at *3-4 (W.D. Ky. Dec. 19, 2013).[4]

The defendant raises no novel arguments in opposition to compelling arbitration in Conforti and Stidham's absence. Like other similarly-situated defendants, she assumed the risk of proceeding in two different forums when she filed suit in state court rather than initiating arbitration under the agreement. *See Painewebber*, 276 F.3d at 202. Her concern that this Court and the state court will reach conflicting interpretations of the arbitration agreement "does not constitute the type of prejudice necessary" to support a finding that the non-joined parties are indispensable parties. *Skipworth*, 2018 WL 6816067, at *3 (quoting *GGNSC Stanford*, 205 F. Supp. 3d at 890). There is no indication that a judgment rendered in Conforti and Stidham's absence would be inadequate, and the defendant is free to name them as parties to arbitration going forward. Finally, as often repeated, policy considerations underlying the FAA favor federal courts' availability to enforce arbitration agreements in diversity cases. *Id.* (citing *Painewebber*, 276 F.3d at 205).

Based on the foregoing, the Court concludes that Conforti and Stidham are not indispensable parties to this action.

### D.     *Colorado River* Abstention

The defendant argues alternatively that this action should be dismissed in deference to the pending parallel state-court action pursuant to *Colorado River Water Conservation Dist.,*

---

[4] Oatis also relies on *Cytec Industries, Inc. v. Powell*, 630 F. Supp. 2d 680 (N.D. W. Va. 2009), which is based on Fourth Circuit precedent and is contrary to *Painewebber* and its progeny. This Court and others within this district have repeatedly rejected application of *Cytec* in analogous cases. *See, e.g., Stacy*, 27 F. Supp. 3d at 783-84 ("[T]he Sixth Circuit has expressly rejected the argument that duplicative litigation and potentially inconsistent legal conclusions over an arbitration agreement are grounds for finding a party indispensable.").

*et al. v. United States*, 424 U.S. 800 (1976). The Supreme Court has observed that federal courts have a "virtually unflagging" obligation to exercise the jurisdiction given to them. *Id.* at 817. Federal courts, however, will defer to the concurrent jurisdiction of the state court in limited circumstances. The Court considers the following factors in determining whether abstention is appropriate:

(1)     whether the state court has assumed jurisdiction over any res or property;

(2)     whether the federal forum is less convenient to the parties;

(3)     avoidance of piecemeal litigation;

(4)     the order in which the jurisdiction was obtained;

(5)     whether the source of governing law is state or federal;

(6)     the adequacy of the state court action to protect the federal plaintiffs' rights;

(7)     the relative progress of the state and federal proceedings; and

(8)     the presence or absence of concurrent jurisdiction.

*Romine v. Compuserve Corp.*, 160 F.3d 337, 340-41 (6th Cir. 1998).

The Court must determine, as a threshold inquiry, whether the concurrent federal and state proceedings are parallel. *Id.* at 339. While the two proceedings must be substantially similar, "exact parallelism is not required." *Id.* at 340 (alteration and citation omitted). Here, the federal and state actions involve the same parties, with the exception of administrators Conforti and Stidham. And although the actions differ procedurally, both cases arise because of the defendant's allegations that the skilled nursing entities were negligent in caring for her mother. Accordingly, they are sufficiently similar to determine whether *Colorado River* abstention should apply.

The most important concern is whether there is a clear federal policy evincing Congress' desire to avoid piecemeal adjudication within the statutory scheme at issue. *Answers in Genesis of Ky., Inc. v. Creation Ministries, Int'l, Ltd.*, 556 F.3d 459, 467 (6th Cir. 2009) (citing *Colorado River*, 424 U.S. at 819). As this Court has previously explained, the Sixth Circuit has made clear that there is no such policy with respect to the FAA. *See Skipworth*, 2018 WL 6816067, at *4 (citing *Answers in Genesis*, 556 F.3d at 467). It follows that the parties' private agreement to arbitrate controls even if piecemeal litigation is the result. Additionally, the risk of piecemeal litigation here is considerably less substantial than where the parallel state court has already decided the enforceability of an arbitration agreement. *See Preferred Care of Delaware, Inc. v. VanArsdale*, 676 F. App'x 388, 394-95 (6th Cir. 2017). Accordingly, the most important factor weighs in favor of exercising jurisdiction.

The remaining factors weigh in favor of exercising jurisdiction or are neutral. There is no indication that the state court has assumed jurisdiction over any property. While the state court obtained jurisdiction first, that proceeding is still in its infancy. The defendants have filed answers in the state action, but there has been no substantive motion practice. Most recently, on July 2, 2019, Kendra filed a motion to compel the defendants to respond to interrogatories, but she withdrew the motion on July 30, 2019. It does not appear that there has been any further activity in the state action since that time. Additionally, there is no suggestion that either court is any more or less convenient than the other.

Although state law principles apply to contract interpretation, the FAA is the is the ultimate source of governing law. *See Painewebber*, 276 F.3d at 208-09. And while the state court would be bound to apply the FAA, it is no secret that Kentucky courts have shown hostility toward pre-dispute arbitration agreements in nursing home settings. *See Skipworth*,

2018 WL 6816067, at *5 (citing *GGNSC Stanford*, 205 F. Supp.3d at 891). Finally, although concurrent jurisdiction exists in this case, abstention is not justified "where a congressional act provides the governing law and expresses a preference for federal litigation." *PaineWebber*, 276 F.3d at 208-09. The FAA expresses a preference for adjudication in federal courts, so concurrent jurisdiction does not support deference to the state-court action in this case. *See Moses H. Cone Memorial Hosp.*, 460 U.S. at 25 n.32.

In summary, the majority of the *Colorado River* factors weigh against abstention. Those that do not (i.e., convenience and the order in which jurisdiction was obtained) are neutral. Accordingly, the Court declines to abstain from exercising jurisdiction.

## E.     Wrongful Death Claim

Wrongful death claims in Kentucky are separate and independent claims which belong not to a decedent or her estate. Instead, these claims arise upon the decedent's death and belong to enumerated statutory beneficiaries. *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 598-99 (Ky. 2012). The wrongful death statute provides:

> [W]henever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it. If the act was willful or the negligence gross, punitive damages may be recovered. The action shall be prosecuted by the personal representative of the deceased. . . . The amount recovered . . . shall be for the benefit of the kindred of the deceased in the following order: . . . (b) If the deceased leaves [a husband] and children, then one-half (1/2) to [the husband] and the other one-half (1/2) to the children of the deceased. (c) If the deceased leaves a child or children, but no [husband], then the whole to the child or children."

K.R.S. § 411.130.

The parties agree that Garred did not have the ability to bind her wrongful death beneficiaries to arbitration. *See Ping*, 376 S.W.3d 581. However, they disagree regarding the

defendant's own agreement to arbitrate the wrongful death claim. The defendant asserts in her motion to dismiss that her "wrongful death claim is not subject to the arbitration agreement(s) because [Garred] and her daughters could not have bound her beneficiaries to arbitrate a wrongful death claim." [Record No. 5-1, p. 40] The defendant does not elaborate much on this argument, and does not indicate who the wrongful death beneficiaries might be.

The plaintiffs contend that Kendra must arbitrate her wrongful death claim because both she and her sister Tavonne agreed to do so when they signed the Admission Agreements and/or Memoranda of Readmission. Additionally, the plaintiffs report that Kendra and Tavonne are Garred's *only* wrongful death beneficiaries. [Record No. 9-1, p. 20] Kendra does not respond to this allegation directly, but implies that this assertion is accurate by stating the following in response to the plaintiffs' motion to compel arbitration: "Defendant's claim for wrongful death against the State Court Defendants is on behalf of the statutory wrongful death beneficiaries of Clementine Garred pursuant to KRS 411.130, including her daughter Tavonne Oatis, who is a resident of the Commonwealth of Kentucky. . . ." [Record No. 11, p. 2] The defendant alleges in the state-court complaint that she also is Garred's daughter, which would make her a wrongful-death beneficiary, as well. [Record No. 1-2, ¶ 2] *See* K.R.S. § 411.130.

It is clear that statutory beneficiaries may elect to arbitrate their own wrongful death claims. *See Nichols*, 811 F.3d at 199. The question is whether the defendant did so here.[5]

---

[5] The Court focuses on the defendant's consent to arbitration for purposes of this analysis, since Tavonne is not a party to this action. However, to the extent Kendra purports to bring the wrongful death claim on behalf of her sister, the Court explores the plaintiffs' argument that both sisters consented to arbitration of the wrongful death claim.

Ordinary principles of contract interpretation apply, so the Court begins by examining the plain

language of the June 28, 2017 Admission Agreement. It begins:

> **I.**     **PARTIES.**     This Admission Agreement ("Agreement") is made this
> 28 day of June, 2017, by and between BLC Lexington SNF, LLC d/b/a
> Brookdale Richmond Place a licensed Nursing Care Institution, located at 2770
> Palumbo Dr., Lexington, KY 40509 (the "Provider," "we," "us" or "our") and
> Clementine Garred (the "Resident," "you" or "your") and/or (Name of
> "Resident Representative") on behalf of Resident, in consideration of the mutual
> covenants contained in this agreement. (Resident and Resident Representative
> may be collectively referred to as "Resident," "you" or "your.")

[Record No. 1-3, p. 1]

> IV. K. <u>RESIDENT REPRESENTATIVE</u>—The Resident Representative may
> be any person who is (i) legally responsible for you (such as a court-appointed
> guardian, conservator or holder of a power of attorney), (ii) appointed by you,
> or (iii) a member of your immediate family. This relationship/granted authority
> should be noted on the Signature Page of this Agreement.

*Id.* at p. 5.

Tavonne executed this Agreement in her capacity as Garred's Resident Representative,

noting that she was Garred's daughter. *Id.* at p. 17. When Garred was readmitted on October

30, 2017, Kendra signed a Memorandum of Readmission as Garred's "Legal Representative."

[Record No. 1-4] The Memorandum incorporated by reference the terms of the June 28, 2017

Admission Agreement.

The first provision of the Admission Agreement clearly provides that a Resident

Representative (which includes a person who is legally responsible for the resident) is a party

to the contract. Although Kendra was acting on behalf of her mother, she was a party to the

agreement as defined by the plain language of the Section I of the June 28, 2017 Admission

Agreement. The Arbitration Provision within the Agreement provides, in relevant part:

> Any and all claims or controversies arising out of, or in **any** way relating to, this
> Agreement or any of your stays at the Provider . . . shall be submitted to binding

- 28 -

arbitration . . . and shall not be filed in a court of law. **The parties to this Agreement further understand that a judge and/or jury will not decide their case. . . . The undersigned acknowledges that he or she has been encouraged to discus this Agreement with an attorney.**

[Record No. 1-3, pp. 12, 14 (emphasis in original)]

Although the Memoranda of Readmission did not spell out these terms, it incorporated them by reference. One who signs a contract is presumed to know its contents, and there is no suggestion that Kendra was not permitted to review the June 2017 Admission Agreement in its entirety. *See Dixon v. Daymar Coll. Grp., LLC*, 483 S.W.3d 332, 346 n.46 (Ky. 2015). By signing the Memorandum of Readmission in October 2017, Kendra indicated that she wished to "be bound and [was thereby] bound by the contractual promises, covenants, and obligations" stated in the Admission Agreement. [Record No. 1-4]

Kentucky courts and federal courts within this district have repeatedly denied motions to compel arbitration of wrongful death claims when the wrongful death beneficiaries were not parties to the arbitration agreement. *See, e.g., Richmond Health Facilities—Madison, L.P. v. Shearer*, No. 5: 17-255-KKC, 2017 WL 3273381, at *6 (E.D. Ky. Aug. 1, 2017); *Paducah Health Facilities, L.P. v. Newberry*, No. 2013-CA-1980-MR, 2015 WL 6780406, at *4 (Ky. Ct. App. Nov. 6, 2015). But that is not the case here. Both sisters were parties to valid arbitration agreements that are sufficiently broad to encompass the wrongful death claims related to Garred's stays at the Facility. *See Nichols*, 811 F.3d at 198 (discussing *Marmet Health Center, Inc. v. Brown*, 565 U.S. 530, 530-32 (family members could agree to arbitration by signing agreements on behalf of nursing home residents)); *Golden Gate Nat. Senior Care, LLC v. Jones*, 2016 WL 4744151 (E.D. Ky. Sept. 12, 2016) (resident's wife was compelled to arbitrate her loss of consortium and wrongful death claims when she signed arbitration

agreement); *Diversicare Leasing Corp. v. Hall*, 2016 WL 10654078, *1-2 (E.D. Ky. Aug. 8, 2016) (wrongful death beneficiary signed arbitration agreement and therefore was a party to it, requiring her to arbitrate wrongful death claims).

Accordingly, the defendant will be compelled to arbitrate her wrongful death claim pursuant to her agreement with the plaintiffs.

### F.      Scope of the Arbitration Agreement

Having determined that both Garred and the defendant entered into valid agreements to arbitrate, the Court also must determine whether all of the defendant's claims fall within its scope. *See Stout*, 228 F.3d at 714.  In this case, the arbitration clause is broad, covering all disputes arising out of or in any way relating to the Admission Agreements or any of Garred's stays at the Facility.  In addition to her wrongful death claim, the defendant claims that the defendants were negligent in caring for Garred during her stays, and that the plaintiffs committed acts of corporate negligence and manipulation of funds in treating Garred's physical ailments.  All of these allegations concern alleged actions that fall within the scope of the arbitration agreement.  Accordingly, all of the defendant's claims must be submitted to arbitration.

### G.      Injunction

Finally, the Court must determine whether the defendant should be enjoined from pursuing her parallel action in state court.  "Although the FAA requires courts to stay their own proceedings where the issues to be litigated are subject to an agreement to arbitrate, it does not specifically authorize federal courts to stay proceedings pending in state courts." *Great Earth*, 288 F.3d at 893 (internal citation omitted).  Pursuant to the more general provisions of the Anti-Injunction Act, "[a] court of the United States may not grant an

injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

In this case, an injunction "properly falls within the exception for injunctions 'necessary to protect or effectuate" the Court's judgments." *Great Earth*, 288 F.3d at 894. An injunction is necessary to prevent the defendant from pursuing her claims in the alternative forum and, in the process, circumventing the parties' agreement to arbitrate. Accordingly, she will be enjoined from proceeding with the pending parallel state-court action.

## IV.     CONCLUSION

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.       The defendant's motion to dismiss [Record No. 5] is **DENIED**.

2.       The plaintiffs' motion to compel arbitration [Record No. 9] is **GRANTED**.

3.       Plaintiff Kendra Oatis is **COMPELLED** to submit her claims to arbitration according to the terms of the June 28, 2017 Admission Agreement and **ENJOINED** from proceeding with her parallel action in state court.

4.       This proceeding is **STAYED** until conclusion of arbitration or intervening order of the Court. The parties are directed to file a joint status report on **Monday, March 2, 2020**, and on the **first Monday of every third month** thereafter until ordered otherwise by the Court.

Dated: November 20, 2019.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky